FIRST DISTRICT COURT OF APPEAL
STATE OF FLORIDA

_____

No. 1D2022-3942
_____

MICHAEL GUGLIELMO,

Appellant,

v.

STATE OF FLORIDA-DOC
ZEPHYRHILLS C I/ DIVISION OF
RISK MANAGEMENT,

Appellee.

_____

On appeal from the Office of the Judges of Compensation Claims.
Robert A. Arthur, Judge.

Date of Accident: July 16, 2021.


July 30, 2025

M.K. THOMAS, J.

Michael Guglielmo, the claimant, timely appeals a final order of the Judge of Compensation Claims (JCC) denying his claims for temporary total disability (TTD) and permanent impairment benefits (PIB) related to an accident accepted as compensable under section 112.18, Florida Statutes (2021), also known as the "heart-lung statute." He asserts, among other arguments, that the JCC erred as a matter of law in concluding that his average weekly wage (AWW) was $0.00 because he was not an "employee" on the date of accident and had no earnings in the preceding thirteen

weeks. We agree and reverse, in part, affirm, in part, and remand for further proceedings.

I. *Facts*

The facts are not in dispute. Guglielmo worked as a police officer for twenty-three years and then retired. Subsequently, he returned to the workforce as a corrections officer at Zephyrhills C.I., Department of Corrections (DOC). Almost two years later, in March 2021, he voluntarily resigned because of health concerns—the stress of the corrections job and exhaustion due to the long hours because of alleged understaffing. At the time of resignation, he was making $673.20 per week. On July 16, 2021, Guglielmo experienced heart palpitations. He sought medical treatment at the emergency room and was diagnosed with atrial fibrillation. He reported his heart condition to DOC.[1] He listed the date of accident for purposes of the workers' compensation claim as July 16, 2021, the day he experienced cardiac issues. DOC accepted compensability of the atrial fibrillation under the "heart-lung statute" and authorized medical care. Dr. Gerczuk, the authorized treating physician, placed Guglielmo on medication but later recommended a cardiac ablation. The ablation was performed on December 16, 2021. Guglielmo was taken off work and later given physical restrictions for a time certain.

Following the ablation, Guglielmo returned to the workforce as a security officer for Valencia College in January 2022.[2] However, he later experienced chest pressure causing him to miss four days of work from February 17 through February 20, 2022. He was hospitalized for complications related to the cardiac ablation. A pericardiocentesis was performed, and his symptoms improved. DOC covered the ablation procedure, related treatment,

---

[1] Pursuant to section 112.18(1)(b)4., Florida Statutes (2021), the claim for the presumption must be filed prior to or within 180 days after leaving the employment. Here, Guglielmo filed his claim approximately 119 days after leaving the employment of DOC.

[2] As a security officer at the college, Guglielmo worked 40 hours per week and was paid between $10.00 and $15.00 per hour.

and hospitalizations as compensable under the July 16, 2021, accident. Guglielmo returned to work at Valencia College on March 1, 2022.

In April and June of 2022, Guglielmo filed petitions for benefits (PFBs) requesting medical and indemnity benefits, including TTD, temporary partial disability (TPD) benefits, PIBs, and penalties, interest, costs, and attorney's fee. He listed July 16, 2021, as the date of accident. DOC filed a Response to PFB which denied the claims for temporary indemnity benefits on the basis that no authorized provider had placed Guglielmo on no-work status. It agreed to provide the requested medical benefits. No response was filed to the second PFB requesting impairment benefits. On the Pre-Trial Stipulation, DOC accepted the listed accident date of July 16, 2021. However, it failed to answer the pre-trial questions as to whether there existed an "Employer/Employee relationship on the date of accident" and whether "Accident or occupational disease accepted as compensable." It stipulated that the atrial fibrillation condition was related to the accident. As a listed specific defense to the claims, DOC asserted "The Employer/Carrier/Servicing Agent denies compensability of arterial and cardiovascular hypertension and/or heart disease." It listed the AWW as $0.00. DOC filed a motion for Pretrial Hearing for Ruling requesting clarification of the specific conditions that Guglielmo claimed under the "heart-lung statute." At a motion hearing, the parties agreed that Guglielmo asserted only an atrial fibrillation condition, and that DOC had accepted the condition as compensable.

During discovery, a DOC representative testified that Guglielmo did not work in the thirteen weeks leading up to July 16, 2021, the claimed date of accident. However, he was paid a lump sum of $3,176.66 during the thirteen weeks (week of May 14-20, 2021) for payout of his annual leave and his "special comp holidays."

Dr. Chernobelsky, Guglielmo's independent medical examiner (IME), testified that Guglielmo could not work from the date of his ablation, December 16, 2021, until the date he returned to work after pericarditis on March 9, 2022. He assigned that date as maximum medical improvement with a 25% permanent

3

impairment rating (PIR). He clarified that his no-work restriction was limited to no work as a first responder.

The testimony of Dr. Gerczuk, the authorized treating physician, was unclear on work restrictions. He testified that following the ablation, Guglielmo was hospitalized for two days, December 16 and 17, 2021. Upon discharge, Dr. Gerczuk was unsure whether he communicated restrictions, but that Guglielmo should have been advised to avoid heavy lifting, exercise, and strenuous activity for a week or two. Guglielmo was hospitalized for the pericarditis from February 17–20, 2022. He assigned restrictions of no driving until cleared by a surgeon. Guglielmo was released by the surgeon for return to work on March 1, 2022. Because of the disagreement in medical testimony as to the PIR, an expert medical advisor, Dr. Perloff, was appointed. He ultimately assigned an 11% PIR.

At the final hearing, Guglielmo narrowed his indemnity claims to TTD benefits from July 16–18, 2021 (initial hospitalization) and December 16, 2021–March 9, 2022 (covering his ablation, complications and resulting hospitalization and time off from work), and PIBs based on an 11% PIR. DOC argued that no indemnity benefits were due and owing because Guglielmo's AWW at the "date of accident," was $0.00. Specifically, DOC reasoned that Guglielmo "was not an employee" on that day because he was not working for DOC and had no earnings in the thirteen weeks immediately preceding the accident date. Alternatively, regarding TTD benefits, it asserted that Dr. Chernobelsky, Guglielmo's IME, had limited the off-work status to only restrict work as a first responder, and Guglielmo was no longer a first responder during the off-work period. In response, Guglielmo argued that because DOC accepted the July 16, 2021, date of accident and atrial fibrillation as compensable under the "heart-lung statute," it conceded that he met all the statutory prerequisites, including that he was an "employee" of DOC with an AWW corresponding to that employment—the employment where he was exposed to the hazards.

In the final order, the JCC found Guglielmo was eligible for five days of TTD (December 16, 2021, and February 17–20, 2022) and PIBs based on an 11% PIR. However, he ultimately denied

4

entitlement to those indemnity benefits because he found that Guglielmo's AWW was $0.00. The JCC reasoned that, because there was no "contract of hiring in force at the time of the accident," there were no "wages," and therefore, no need to resort to section 440.14, Florida Statutes, for calculation. However, even if required to do so, he determined Guglielmo had no earnings in the thirteen weeks before the accident date and there were no "similar employees" at the DOC. The JCC explained as follows: "As the claimant's accident date occurred 119 days (17 weeks) after leaving his employment, he was not an employee in the 13 weeks preceding his accident."

Guglielmo timely moved for rehearing on multiple grounds, including, in the very least, that section 440.14(1)(d), Florida Statutes, should act as a fallback provision to arrive at a reasonable AWW. DOC did not raise an alternative argument that because only five days of temporary benefits were awarded, section 440.12(1), Florida Statutes, barred entitlement.[3] The JCC denied rehearing.

Guglielmo appeals, arguing the JCC reversibly erred, as a matter of law, by concluding that: 1) he was not an "employee" on the date of accident because he was not receiving wages; and 2) he was not entitled to TTD or PIR benefits because his AWW was $0.00. He also disputes that competent, substantial evidence exists to support the JCC's determination that he was only eligible for five days of TTD benefits.

---

[3] Section 440.12(1) Florida Statutes, bars payment of indemnity benefits, regardless of the AWW dispute, in certain circumstances. Section 440.12(1), instructs, "Compensation is not allowed for the first 7 days of the disability, except for benefits provided under s. 440.13. However, if the injury results in more than 21 days of disability, compensation is allowed from the commencement of the disability." Accordingly, we do not address the issue on appeal.

## II. *Analysis*

Where a JCC's ruling is based on the interpretation of a statute and a stipulation, the issue must be reviewed de novo. *Holcombe v. City of Naples/Johns E. Co., Inc.*, 328 So. 3d 311, 314 (Fla. 1st DCA 2021). The standard of review on appeal of workers' compensation orders is "whether there is competent substantial evidence in accordance with logic and reason to sustain the findings of the [JCC]." *Punsky v. Clay Cnty. Sheriff's Off.*, 18 So. 3d 577, 583 (Fla. 1st DCA 2009) (quoting *Chavarria v. Selugal Clothing Inc.*, 840 So. 2d 1071, 1076 (Fla. 1st DCA 2003)), *review denied*, 22 So. 3d 539 (Fla. 2009).

Initially, Guglielmo argues that the JCC erred as a matter of law in finding that his AWW was $0.00 because he was not an "employee" of DOC on the date of accident. Specifically, the JCC failed to recognize that DOC's acceptance of compensability under the "heart-lung statute" equated to a concession that each element required for the statutory presumption was satisfied, including that Guglielmo was a covered "employee." Thus, DOC's decision to accept compensability under section 112.18, which requires employee status and proof of disability, is not independent from "employee" status for purposes of AWW calculation. We agree and reverse on this point.

Injured workers who satisfy the requirements of the "heart-lung statute" are afforded the presumption of occupational causation. *See* § 112.18(1), Fla. Stat. (2021); *Seminole Cnty. v. Braden*, 378 So. 3d 637, 642–43 (Fla. 1st DCA 2023). Upon accepting the claim as compensable under section 112.18, DOC conceded that the requirements were satisfied—Guglielmo was a covered correctional officer, the pre-employment physical components were considered, he contracted heart disease, and he suffered disablement. At no time since DOC accepted the claim as compensable has its position changed. It has continued to provide medical benefits. However, it disputes any liability for indemnity benefits to Guglielmo, not based on *eligibility* but because of *entitlement* (as his AWW is $0.00, the mathematical formula for

the compensation rate provides zero benefit payment).[4] Thus, DOC contention that Guglielmo's AWW was $0.00 is the antipode of DOC's acceptance of compensability of the injury/condition and ignores the core principles of occupational disease under section 440.151, Florida Statutes.

We begin with a distinguishing factor of occupational disease claims—"disability." Guglielmo carried the burden to satisfy "disability" as required by sections 112.18 and 440.151(1)(a), Florida Statutes (2021). By accepting compensability of Guglielmo's claim under the "heart-lung statute," DOC conceded that he suffered a "disability." *See Friesen v. State of Fla. Highway Patrol/Div. of Risk Mgmt.*, 364 So. 3d 1051, 1055 (Fla. 1st DCA 2023). We look to section 440.151(3), Florida Statutes (2021), for the definition of "disablement." It refers the reader to "disability as described in s. 440.02(13)." § 440.151(3), Fla. Stat. (2021). According to that statute, "'Disability' means incapacity because of the injury *to earn in the same or any other employment the wages which the employee was receiving at the time of the injury*." § 440.02(13), Fla. Stat. (2021) (emphasis added).[5] The plain language of the definition unambiguously focuses on the wages the employee was receiving at the time of the injury. It also contemplates scenarios in which an employee may leave the subject employment and seek other work. And the Florida Supreme Court has clarified that "it is the disability and not the disease which determines compensability of a claim." *Am. Beryllium Co. v. Stringer*, 392 So. 2d 1294, 1296 (Fla. 1980).

"Disablement" also determines the "date of accident." *See* § 440.151(1)(a), Fla. Stat. The disablement of an employee resulting from an occupational disease shall be treated as the happening of an injury by accident so long as the disease "resulted from *the nature of the employment*." *Id.* (emphasis added). The time

---

[4] A claimant may be eligible for benefits, but not necessarily automatically entitled to them. *See ESIS/ACE Am. Ins. Co. v. Kuhn*, 104 So. 3d 1111, 1113 (Fla. 1st DCA 2012).

[5] As of 2023, "Disability" is now defined in section 440.02(15), Florida Statutes.

of injury means the period or periods of exposure. *Friesen*, 364 So. 3d at 1056.

The full text of section 440.02(28)'s definition of "wages" also informs this analysis.[6] "Wages" is defined as the rate at which the employee was paid for his or her services at the "time of injury" and includes only those wages reported for federal tax purposes "*on the job where the employee was injured.*" § 440.02(28), Fla. Stat. (2021) (emphasis added). In occupational disease claims, the injury or exposure must occur during the employment. That is not to say that such injury necessarily manifests itself during the period of active-duty status. Having set forth the distinctive and deliberate terms and phrases used by the Legislature in the occupational disease statutes, we turn to section 440.14 and AWW calculation.

Applying the provisions of section 440.14 in a vacuum—treating the "date of accident" as literal and unconditional—fails to appreciate the unique interplay in occupational disease cases between the terms "injury" and "disability" and ignores public policy. The definition of "disability" deliberately uses the term "injury" and "time of injury" as the critical time focus. It does not use the term "accident." *See* § 440.02(13), Fla. Stat. (2021). Furthermore, the definition of "wages" pinpoints those earnings at the "time of injury" which in occupational disease cases relates to the period of exposure. *See* § 440.02(28), Fla. Stat. (2021). This Court emphasized the special nature of occupational disease claims in *City of Port Orange v. Sedacca*, 953 So. 2d 727, 729 (Fla. 1st DCA 2007):

> Workers' Compensation Act, Chapter 440, Florida Statutes, provides coverage only "if the employee suffers an accidental injury." § 440.09(1), Fla. Stat. (2002). This coverage prerequisite is commonly referred to as an "injury by accident." Without an injury by accident, the Act provides no coverage and is inapplicable. An exception to the actual "injury by accident" requirement allows an employee's disease or medical condition to be

---

[6] Effective July 4, 2023, the definition of "wages" is found in section 440.02(40), Florida Statutes.

"treated as the happening of an injury by accident" if he is able to establish, he has an occupational disease.

Section 440.14(1)[7] instructs as follows,

> (1) Except as otherwise provided in this chapter, the average weekly wages of the injured employee on the date of the accident shall be taken as the basis upon which to compute compensation and shall be determined, subject to the limitations of s. 440.12(2) . . . .

The subsection begins with an important clarifying phrase, "except as otherwise provided in this chapter." As previously established, "disablement" in occupational disease cases sets the "date of accident." And the disablement must result from the nature of the employment where the employee was last injuriously exposed. We do not look beyond section 440.151 to define its relevant terms. *See Watkins Eng'rs & Constructors v. Wise,* 698 So. 2d 294, 295 (Fla. 1st DCA 1997) (holding occupational disease provision language of section 440.151 is "plain," and "so long as an occupational disease fits within the criteria enumerated therein*,* such disease constitutes a compensable injury") (emphasis added). This Court has declined to incorporate other subsections of the Act to supplement the clearly delineated requirements set forth in section 440.151. *See id.* at 295. In *Caldwell v. Division of Retirement, Florida Department of*

---

[7] To determine a particular claimant's AWW, section 440.14 sets forth several methods: (a) average of wages over the 13 weeks preceding injury; (b) average of similar employee's wages 13 weeks preceding injury; (c) average of 52 weeks preceding injury for seasonal workers; (d) if any of the foregoing methods cannot reasonably and fairly be applied, the full-time weekly wages of the injured employee; (e) if it is established that the injured employee was under 22 years of age when injured and that under normal conditions her or his wages should be expected to increase during the period of disability, the fact may be considered in arriving at her or his average weekly wages; (f) consideration of part-time employment; and (g) instructions for computing compensation owed for fraction of week. § 440.14(1), Fla. Stat. (2021).

*Administration*, 372 So. 2d 438, 440–41 (Fla. 1979), the Florida Supreme Court announced that the presumption statute should be interpreted in a manner consistent with social policy and the beneficial purposes intended. Accordingly, and pursuant to the phrase in section 440.14, "as otherwise provided in this chapter," sections 440.151, 440.02, and 112.18 inform the application of section 440.14 in occupational disease cases.

Having set forth the key definitions and principles of occupational disease claims, we begin with section 440.14(1)(a). The relevant "wages" for purposes of calculation are those paid to Guglielmo for his services at the "time of injury" and on the job where the injury occurred. And as the parties stipulated, there existed 13-weeks of wages preceding the last injurious exposure (Guglielmo's last day of work) which provided an AWW of $673.20.

DOC accepted compensability of the heart disease claim under a July 16, 2021, date of accident—the date determined by "disability." But with respect to indemnity benefits only, DOC declared that Guglielmo was not an "employee" at the time of the "accident"—ignoring the substantive meaning of "injury" and that the relevant "wages" in an occupational disease context are those received for services performed during the exposure period. DOC conceded in the initial acceptance of compensability of the atrial fibrillation condition that Guglielmo was an employee and suffered exposure to the hazards of the correctional officer job. As such, it is axiomatic that the AWW is also tethered to that very employment. Applying that rationale here—sections 440.151, 440.02, and 112.18 inform section 440.14 so that in an occupational disease context, the time of injury (when last injurious exposure occurred) is the period of relevant wages. DOC cannot have it both ways—accepting compensability of the injury as resulting from the hazardous exposure of its work environment but then asserting that on the date of disability (the date section 440.151 assigns as the "date of accident") the claimant was not an employee. *See Jones v. ETS of New Orleans, Inc.*, 793 So. 2d 912, 914–15 (Fla. 2001) (noting that a "statute should be interpreted to give effect to every clause in it, and to accord meaning and harmony to all of its parts").

The notion that a claimant's technical administrative status regarding employment on *the* date of "accident" in occupational disease claims (meaning the date the injury or condition manifests itself and disability occurs) determines an employer's liability has been addressed by this Court, albeit under an earlier version of the statute. In *Smith v. City of Miami*, 552 So. 2d 245, 245 (Fla. 1st DCA 1989), a firefighter, who became disabled with heart disease after retirement, filed a claim under section 112.18. The deputy commissioner concluded that the Legislature did not intend to create a presumption applicable to anyone other than a presently employed fireman and dismissed the claim. *Id.* This Court affirmed the dismissal using a 1987 statutory definition of fireman. *Id.* at 245–46. It defined "fireman" as "any duly employed uniformed fireman." *Id.* at 245. The language was interpreted to require that for a "heart-lung statute" claim, the fireman must be on active-duty status when the injury manifests itself. *Id.* at 245–46.

In *City of Clearwater v. Carpentieri*, 659 So. 2d 357 (Fla. 1st DCA 1995), this Court again addressed employment status as a pre-requisite for filing a viable "heart-lung statute" claim. The firefighter claimant put in for retirement but suffered a heart attack one day before his retirement was officially accepted by the employer and his pension awarded. *Id.* at 358. The effective, formal date of his retirement was almost nine months later, an extended date because he elected payment for his accumulated vacation and sick time and floating holidays. *Id.* During this extended period, he was not working but still on active payroll status until the benefits were paid out. *Id.* The employer denied compensability of the "heart-lung statute" claim because the claimant was not on active-duty status. *Id.* at 359–60. The JCC found that the claimant was entitled to the presumption of compensability. *Id.* at 359. This Court affirmed, finding the claimant was on active status because he was still on the books and getting paid. *Id.* at 360.

Then, in 1993, the Legislature amended the definition of "law enforcement officer, correctional officer or probation officer" by removing the requirement of being "duly employed." *See* § 112.19, Fla. Stat. In 2010, the Legislature amended section 112.18, adding subsection (1)(c)4., which provides as follows: "a law enforcement officer, correctional officer, or correctional probation officer is not

11

entitled to the presumption provided in this section unless a claim for benefits is made prior to or within 180 days *after leaving the employment of the employing agency.*" § 112.18(1)(c)4., Fla. Stat. (2010) (emphasis added); *see also St. Lucie FCRD & PGCS v. FMIT*, 259 So. 3d 992, 993 (Fla. 1st DCA 2018) (declining to recognize *Carpentieri* as "muddy[ing] the bright line" drawn in *Smith* that held that "the presumption does not apply to people who retire from firefighting before their date of accident;" statutory changes were not addressed in the opinion). These amendments document the Legislature's clear intent that, for a viable claim under the "heart-lung statute," a claimant does not have to be in active-duty status on the "date of the accident." The Legislature is presumed to know the judicial construction of existing law when it enacts a new law and to have adopted prior judicial constructions of a law unless a contrary intention is expressed in the statute. *ContractPoint Fla. Parks, LLC v. State*, 958 So. 2d 1035, 1037 (Fla. 1st DCA 2007) (citing *Jones v. ETS of New Orleans, Inc.*, 793 So. 2d 912 (Fla. 2001)).

The JCC relied on *Fast Tract Framing, Inc. v. Caraballo*, 994 So. 2d 355 (Fla. 1st DCA 2008), in arriving at an AWW of zero. But the case is readily distinguishable. *Caraballo* did not address an occupational disease claim. Furthermore, it addressed the issue of whether wages not reported for federal tax purposes could be utilized to calculate AWW. *Id.* at 356. *Caraballo's* declaration that "wages," as defined by section 440.02, controls the AWW calculation, serves only to support Guglielmo's AWW calculation of $673.20—based on wages earned in service at the time of the injurious exposure.

The reasoning of the JCC is best summarized in the following excerpt from the final order:

> In the present case, there was no contract of hiring in force at the time of the injury, as the claimant had voluntarily terminated his employment 119 days (17 weeks) before his injury and did not work in any other employment during this time period. As there was no contract for hiring in force and the claimant did not work in the 13 weeks prior to the injury, he had no wages.

He defined the "injury" as synonymous with the date of accident or July 16, 2021. But this ignored that "injury" and "accident" (set by date of disablement) have different meanings in the context of occupational disease. Section 440.14(1)(a), which the parties utilized in their calculations to stipulate to the $673.20 AWW for the DOC employment (for the 13 weeks preceding his last day of work/exposure), is the appropriate section for calculation. The injury period dictates the relevant wages. Guglielmo had 13 full weeks of wages immediately preceding his last day of work (last date of "injury" due to exposure) to review. Thus, there was no need to resort to alternative methods of calculation provided in section 440.14.

Regarding Guglielmo's argument that competent, substantial evidence does not exist to support the JCC's finding that but for a zero AWW, he was eligible for only five days of TTD and PIBs based on an 11% impairment rating, we find it lacks merit and affirm. Guglielmo is entitled to payment of the indemnity benefits using an AWW of $673.20. The case is remanded for the JCC to award the five days of TTD benefits and determine PIB payments, subject to the provisions of section 440.15(3)(c), Florida Statutes.[8]

*Concurring and Dissenting Opinion*

The concurring in part opinion is a recapitulation of the majority opinion. As for the dissenting in part opinion, it misapplies section 440.12(1) and improperly interjects a defense not raised by a party to the case.

Guglielmo is entitled to the payment of PIBs and five days of TTD (despite the absence of more than 21 days of disability)

---

[8] Section 440.15(3)(c), Florida Statutes, provides that impairment benefits may be reduced by 50 percent for each week in which the employee has earned income equal to or in excess of the AWW. Aside from TTD benefits under section 440.15(2), which are automatically payable at the compensation rate, vocational factors such as what the claimant is able to earn may also be considered in calculations for TPD benefits. DOC raised voluntary limitation of income defenses in the Pre-Trial Stipulation.

because the defense that payment is not due and owing pursuant to section 440.12(1), was not raised by DOC. "The party raising affirmative defenses has the burden of pleading and proving them." *Teco Energy, Inc. v. Williams*, 234 So. 3d 816, 823 (citing *McKenzie Tank Lines, Inc. v. McCauley*, 418 So. 2d 1177, 1180 (Fla. 1st DCA 1982)). "Affirmative defenses must also be timely raised by the party seeking to avoid responsibility or consequence." *Andrews v. McKim & Creed*, 355 So. 3d 957, 961 (Fla. 1st DCA 2023) (citing Fla. Admin. Code R. 60Q-6.113(2)(a)); *See also Ballard v. Edd Helms Group*, 79 So. 3d 88, 89 (Fla. 1st DCA 2011) (overpayment defense based on claimant's receipt of unemployment benefits was untimely asserted when raised for first time in closing argument after the hearing).

A waived defense cannot be raised, sua sponte, by an appellate court judge.[9] Although the "tipsy-coachman" doctrine allows this

---

[9] "In order to be preserved for further review by a higher court, an issue must be presented to the lower court and the specific legal argument or ground to be argued on appeal or review must be part of that presentation if it is to be considered preserved." *Tillman v. State*, 471 So. 2d 32, 35 (Fla. 1985). "An appellate court is 'not at liberty to address issues that were not raised by the parties.'" *Rosier v. State*, 276 So. 3d 403, 406 (Fla. 1st DCA 2019) (citing *Anheuser-Busch Co., Inc. v. Staples*, 125 So. 3d 309, 312 (Fla. 1st DCA 2013)). "Nor may an appellate court 'depart from its dispassionate role and become an advocate by second guessing counsel and advancing for him theories and defenses which counsel either intentionally or unintentionally has chosen not to mention.'" *Id.* (citing *Polyglycoat Corp. v. Hirsch Distribs., Inc.*, 442 So. 2d 958, 960 (Fla. 4th DCA 1983)); *see also D.H. v. Adept Cmty. Servs., Inc.*, 271 So. 3d 870, 888 (Fla. 2018) (Canady, C.J., dissenting) ("[I]t is not the role of the appellate court to act as standby counsel for the parties.")). "Instead, an appellate court must confine its decision to the issues raised in the briefs." *Id.* (citing *Bainter v. League of Women Voters of Fla.*, 150 So. 3d 1115, 1126 (Fla. 2014) ("'Basic principles of due process'—to say nothing of professionalism and a long appellate tradition—'suggest that courts should not consider issues raised for the first time at oral argument' and 'ought not consider arguments outside the

Court to affirm a trial court judgment that is "right for the wrong reason," the record must support the theory or argument. *See Robertson v. State*, 829 So. 2d 901, 906—07 (Fla. 2002) ("The key to the application of this doctrine of appellate efficiency is that there must have been support for the alternative theory or principle of law in the record before the trial court."). Section 440.12(1) was never raised before the trial court or in any briefing.

AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings consistent with this opinion.

LONG, J., concurs; TANENBAUM, J., concurs in part and dissents in part with opinion.

---

*Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.*

---

TANENBAUM, J., concurring in part and dissenting in part.

The claimant worked as a correctional officer for the Department of Corrections from June 2019 until his voluntary retirement on March 20, 2021. On July 16, 2021, nearly four months following his retirement, the claimant suffered an atrial fibrillation ("afib") that sent him to the emergency room. The department accepted this medical condition as compensable under the Workers' Compensation Law (chapter 440, Florida Statutes) based on its understanding of section 112.18(1), Florida Statutes. By accepting compensability in connection with section 112.18, the department essentially acknowledged that the afib was a "condition or impairment of health" that was "accidental" and "suffered in the line of duty." § 112.18(1)(a), Fla. Stat.; *see also id.*

scope of the briefing process.'") (quoting *Powell v. State*, 120 So. 3d 577, 591 (Fla. 1st DCA 2013))).

15

(making this presumption applicable to, among others, a "correctional officer"). Once the department acknowledged this compensability, it was obligated to "pay compensation [and] furnish benefits required by" chapter 440. § 440.09(1), Fla. Stat.; *see also id.* (making compensability contingent upon an employee's "suffer[ing] an accidental compensable injury [] arising out of work performed in the course and the scope of employment"); *City of Port Orange v. Sedacca*, 953 So. 2d 727, 735 (Fla. 1st DCA 2007) (en banc) (explaining that "in every case" involving a question of compensability, there must initially be a determination of "whether a claimant's medical condition is covered under the Act").

Workers' compensation coverage having been conclusively established regarding the claimant's afib, the only remaining question would be "what benefits are due." *Sedacca*, 953 So. 2d at 735. Even though the department accepted the medical condition as compensable—meaning the claimant was eligible for medical benefits related to that condition under section 440.13, Florida Statutes, as qualifying treatment became necessary—the claimant would not have been entitled to indemnity for lost wages until he suffered a "disablement." § 440.151(1), Fla. Stat.; *cf. Sedacca*, 953 So. 2d at 732 (explaining that a claimant who suffers an occupational disease does not become eligible for indemnity until the disease adversely affects his ability to work); *id.* at 733 ("No disability means no occupational disease [under section 440.151, Florida Statutes]."). The judge of compensation claims ("JCC") found that the claimant suffered temporary total disability ("TTD") both when he went into the hospital for one day for a cardiac ablation related to the afib—in December 2021—and for four days to be treated for complications stemming from that ablation—in February 2022. The evidence showed that on those five days, the claimant could not work at all. *Cf.* § 440.15(2)(a), Fla. Stat. (describing TTD as "disability total in character but temporary in quality"); *Xerographics & Claims Ctr. v. Bender*, 558 So. 2d 514, 515 (Fla. 1st DCA 1990) (describing TTD "as the healing period during which the workers' compensation claimant is, by reason of the injury, totally disabled and unable, in any anatomic sense, to work"). Contrary to the claimant's assertion, there is sufficient evidence to support this finding.

The claimant, then, became eligible for indemnity benefits once he suffered disablement stemming from his compensable medical condition—the afib suffered in July 2021. In determining the average weekly wage ("AWW") under section 440.14(1), Florida Statutes, the JCC erred when he used the date the claimant suffered afib (July 16, 2021) as the date of accident and concluded that he had not worked "substantially the whole of 13 weeks immediately preceding the accident." § 440.14(1)(a), Fla. Stat.; *see id.* (setting out the primary method for calculating the AWW "on the date of the accident" to be "taken as the basis upon which to compute compensation"). This case being one that involves occupational disease, the claimant's "last injurious exposure giving rise to eligibility for coverage is the date of accident, and consequently, *defines the compensation and benefits available*." *Sedacca*, 953 So. 2d at 730 (emphasis supplied).

The claimant's last day of exposure in this presumption case necessarily was his last day of work in March 2021, and there is no dispute that he worked as a correctional officer for the department for the preceding thirteen weeks. There also is no dispute as to what his weekly pay-rate was for those final thirteen weeks—$673.20. The claimant's AWW—based on the uncontested facts of this case—is $673.20. It is that amount, rather than zero, that the JCC would have had to use to calculate the claimant's TTD indemnity (not to mention his impairment benefit). As to the proper calculation of AWW under the unique circumstances of this case, I concur with the majority's conclusion.

That said, I still would affirm the order to the extent it denies the claim for TTD compensation. A JCC is an administrative hearing officer in the executive branch, and his statutory charge is to "make such investigation or inquiry, or conduct such hearing, in such manner as to best ascertain the rights of the parties" under chapter 440 regarding a petition for benefits. § 440.29(1), Fla. Stat. Here, the JCC concluded "there are no TTD benefits due for the limited days the claimant was hospitalized" and denied the claim. His legal basis was the "$0 AWW," a basis that both the majority and I have explained is incorrect. There, however, is an alternative legal basis to support the JCC's conclusion: section 440.12(1), Florida Statutes, which categorically proscribes a compensation award "for the *first 7 days* of the disability." (emphasis supplied).

17

The JCC found that there was evidence to support "total disability" during only the *five* days the claimant was hospitalized in December 2021 and February 2022. The petition sought benefits only for TTD and permanent impairment. But the TTD benefit will not be "ripe, due, and owing" until he can prove at least eight days of disability, which, according to the JCC, he could not yet do. § 440.192(1), Fla. Stat. (specifying when a claimant may file a petition for benefits). Even with a proper calculation of the AWW, the claimant had no right to TTD compensation based on the JCC's finding as to the TTD dates. *Cf. Sinclair v. ManorCare Health Servs.-Dunedin*, 224 So. 3d 331, 332 (Fla. 1st DCA 2019) (setting aside in part the JCC's order because though the finding as to the dates of TTD was sufficiently supported by evidence, "an application of the law [section 440.12(1)] to these findings indicate[d] that the JCC erred to the extent the TTD award include[d] the first seven days of the disability period").

The JCC's conclusion (*viz.* that "there are no TTD benefits due") is correct, then, albeit for a different reason. We are required to affirm that portion of the order. *Cf. Cohen v. Mohawk, Inc.*, 137 So. 2d 222, 225 (Fla. 1962) (holding that if "the pleadings and evidence before the [lower tribunal]" reveal "*any* theory or principle of law which would support the" final order, "the district court [is] obliged to affirm"); *Applegate v. Barnett Bank of Tallahassee*, 377 So. 2d 1150, 1152 (Fla. 1979) (holding that the lower tribunal's final order "could well be wrong in its reasoning, but [its] decision . . . is primarily what matters, not the reasoning used"; so "[e]ven when based on erroneous reasoning, [the tribunal's] conclusion or decision . . . will generally be affirmed if the evidence or an alternative theory supports it"); *Dade Cnty. Sch. Bd. v. Radio Station WQBA*, 731 So. 2d 638, 644 (Fla. 1999) (explaining that if the lower tribunal "reaches the right result, but for the wrong reasons, it will be upheld if there is any basis which would support [it] in the record"). It is of no moment that the employer did not raise in its answer brief this alternate basis for affirmance. *See Freeman v. State*, 373 So. 3d 1255, 1257 n.2 (Fla. 1st DCA 2023) (noting that the alternate ground for affirmance need not have been argued before the lower tribunal nor raised by the appellee in its answer brief).

18

As explained above, the AWW should not have been zero. There otherwise being no basis for denying the impairment benefit claim, I concur in the majority's setting aside that portion of the final compensation order. The claimant, though, failed to demonstrate he, as of yet, had a right to a TTD benefit. Insofar as the majority sets aside the order's denial of that claim, I dissent.

———————————————

Kristine Callagy and Megan E. Oliva of Bichler & Longo, PLLC, Maitland, for Appellant.

Jane E. McGill of Vaughan Baio & Partners, Palm Beach Gardens, for Appellee.